1926.]                State, ex rel, v. Lemon, Clerk.

## MUNICIPAL REFERENDUM PETITIONS MUST STRICTLY COMPLY WITH THE LAW.

Common Pleas Court to Mahoning County.

### STATE, EX REL., V. LEMON, CLERK.

Decided September 19, 1925.

*Referendum Prerequisites—Affidavits of Solicitors of Signatures Are Invalid, When—Withdrawals of Signatures and Revocation of Withdrawals—Duties of a City Clerk Purely Ministerial—Action by Him of a Judicial Character Invalid, Even Though Subsequently Confirmed By An Authorized Judicial Inquiry.*

1. Exercise of the power of referendum by a municipality is conditioned on a due and solemn observance of the provisions of law enacted as a vehicle therefor.  The constitution itself provides that without such proper observance this reserved power cannot be used.

2. The only validity a referendum petition or part of such a petition has, is based on the existence and validity of the accompanying affidavit.  While the statutory provision as to the contents of the affidavit does not include the words "that each of the signatures attached to such part was made in the presence of the affiant," as is the case in referendums on state laws, the remaining requirements are of such a character as to have that effect.

3. Where an affidavit was sworn to by a person who did not circulate the part to which it is attached, it is invalid, and such part must be rejected; so also, where there was a wholesale procuring of names in the confusion and distraction of a holiday crowd gathered in a public park, where it was impossible for the solicitor to make oath that to the best of his knowledge and belief the persons who signed did so with knowledge of the contents; or where the signers were known to the solicitor not to be electors of the city; or where names were signed by others than the persons whose names were so written, unless the signing was done in the presence of and with the knowledge of and at the direction of the persons whose names were so written, though the solicitor may properly fill in other data, such as street addresses, etc.

4. A city clerk is a ministerial officer only, and the intelligent discretion which he is required to exercise does not authorize any use of the judicial prerogative; and where this is done his action is invalid, notwithstanding a subsequent authorized judicial inquiry confirms his findings.

*Metcalfe & Cannon,* on behalf of relator.

*W. E. Lewis,* Law Director, on behalf of respondent.

JENKINS, J.

This action is brought by the relator who seeks a writ

of mandamus to compel the respondent, John H. Lemon, as clerk of the city of Youngstown, to certify to the deputy state supervisors of elections of Mahoning county a petition filed with him, ordering a referendum election on an ordinance passed by the council on July 10, 1925, granting a franchise to the East Ohio Gas Company.   The relator alleges that on August 8, 1925, a petition in all respects conforming to G. C. 4227-1 to 4227-13 and Section 82 of the city charter was filed with the clerk, containing 5,528 signatures of electors of the city, a number greater than six per cent. of the total votes cast for mayor at the last preceding election.   He also alleges that on August 22, 1925, the city clerk refused to make such certification. The sufficiency of the petition is denied in his answer by the clerk, who admits his refusal to certify the same.   The question is before this court for a judicial inquiry into the legal sufficiency of the petition.   If sufficient, the writ will be granted; if not, it will be refused.

By the Constitution (Article II, Section 1f) the power of referendum is reserved to the people of each municipality, which power, "shall be exercised in the manner now or hereafter provided by law."

The exercise of this fundamental right is thus conditioned upon a due and solemn observance of the provisions of law enacted as a vehicle therefor.   Without such proper observance, the Constitution itself provides that the reserved power cannot be used.

Irregular and fraudulent exercise of the power must therefore be strictly guarded against and a strict compliance with the manner provided by law for its exercise must be exacted.

It is provided by G. C., 4227-4, that "each part of a referendum petition shall contain the affidavit of the person soliciting the signatures to the same, which affidavit shall contain a statement of the number of signers of such part of such petition, and shall state that to the best of his knowledge and belief each of the signatures contained on such part is the genuine signature of the person whose name it purports to be, and believes that such persons are electors of the municipal corporation and that they signed such petition with knowledge of the contents thereof."

The only validity a part of a referendum petition has is based on the existence and validity of the accompanying affidavit. If no affidavit whatever is attached to a part, such part would have to be entirely rejected, no matter how genuine the signatures thereon or how qualified and well informed the signers.

Likewise if the affidavit is proven to be wilfully, corruptly and intentionally false, it is worse than no affidavit at all, and the whole of such part of the petition to which such false affidavit is attached must also fall, no matter if many of the signatures thereon were genuine.

The first inquiry then must be, do all the parts of the petition bear affidavits as required, and are such affidavits valid or false. In this case the petition consisted of 84 parts.

All the parts bear affidavits. While the statutory provision above quoted as to the contents of the affidavit does not include the words "that each of the signatures attached to such part was made in the presence of the affiant" as is the case in referendums on state laws provided for in Art. I, Sec. 1g, the remaining requirements are of such character as to have such effect. It appears from the evidence, without dispute, that parts No. 1, 5, 33, 48, 71, 73 and 76 were sworn to by persons who did not circulate either the whole or some portion of the same and could not therefore have been in a position to make a valid affidavit covering all the required points. Such named parts must therefore be rejected. These include 424 names.

Parts No. 24, 46 and 49 are in dispute as to whether they were circulated and all the signatures thereon secured by the persons signing the respective affidavits. The weight of the evidence on parts 24 and 49 appears to be that they were not so circulated and secured, while as to part 46 it appears that they were. Parts 24 and 49, containing 117 names are therefore rejected.

The court confesses that it was shocked by the revelations of the evidence as to the manner in which a number of parts of the petition were circulated and signatures thereon secured. Particularly is this true of the wholesale procuring of signatures in the confusion and distraction of a holiday crowd of picknickers at Idora Park. The

solicitors simply could not in good faith swear that to the best of their knowledge and belief the persons who signed the petition did so with knowledge of the contents thereof. The circumstances were such, as to many hundreds of signatures, that the circulator could not have believed the signers knew the nature and import of the document signed. It must in fairness be said that there is no evidence of any affirmative misrepresentation of the purpose of the petition to induce signatures thereto; there was simply gross inadequacy of explanation and insufficient opportunity given the signers to become familiar with the contents.

To repeat what has been said, referendum petitions have no validity aside from the validity of the affidavits accompanying them. There is then a great, solemn and direct personal responsibility on each solicitor as to how his work of solicitation is done and signatures obtained. Irregular conduct on his part jeopardizes the public rights involved in the petition he is circulating; and is a grave injustice to those informed citizens who in good faith sign their names to petitions which are invalidated by his behavior.

How simple it would have been to have explained that the purpose of the petition was to bring about a vote at the next election on the ordinance providing for higher gas rates. A single sentence, perhaps, with a reasonable opportunity to the signer of examining the petition if he desired, would have been enough.

The duty to know that the signers had knowledge of the contents of the petition required greater care on the part of the solicitor under the conditions prevailing at the park than where house to house solicitation was had; for in the latter case attention of the signer was naturally concentrated on the paper signed, without disturbance and diversion as was the case at the park. In practice as disclosed by the evidence, the opposite course was too often taken.

In several instances the evidence is that persons known to the solicitor not to be electors of the city were, with his knowledge, permitted and even requested to sign. In such cases, of course, he could not truly swear that he believed them to be electors of the municipal corporation.

As the Constitution says, the reserved right of referendum must be exercised in the manner provided by law. A sacred right must not be made a pitiful farce. Affidavits which the persons making did not and could not believe to be true are not made "in the manner provided by law;" and for the safeguarding of this power they must be rejected. This court cannot place the stamp of its approval on such improper procedure.

For the reasons stated the court is impelled to rule out parts No. 6, 7, 8, 16, 22, 23, 42, 47, 52, 59, 60, 61, 65, 67, 68, 72, 80, 82 and 83. These parts contain 1,505 names. Counsel for the defendant strenuously contend that a number of other parts should for the same reasons be ruled out. To this we are unable to agree, although many irregularities, but not sufficient to invalid the affidavit in the opinion of this court, appear thereon.

A great many instances occur of names being written on the petitions by persons other than the ones whose names are so written. Many whose names were so written were not present in person at the time of the writing and some had no knowledge until later that their names had been so used. It is contended by the defendant that to comply with the statute requiring that each of the signatures shall be the genuine signature of the person it purports to be, and with the further penal clause providing a fine for anyone signing a name other than his own, all names placed on the petition by some one other than by the owner of the name himself in his own handwriting or accompanied by his own mark personally affixed, must be considered illegal. It is further contended that the affidavits to the parts of petitions on which such names appear must be held invalid for the reason that the circulator knew such names were not the genuine signatures of the persons whose names they purport to be.

Wide divergence of opinion has been expressed in this case by counsel on either side and by the court as to the meaning of the expressions "genuine signature," "signed" and "signers." When learned counsel, with considerable show of logic and authority, claim genuine signatures to include the names of persons written without their knowl-

edge or personal presence by others, but later ratified, it is too much to urge that a layman who in apparent good faith takes such signatures did not do so to the best of his knowledge and belief as genuine signatures.

However, whatever may be said about the good faith of the solicitors in that regard, this court is firmly of the opinion that the "genuine signature" of a person to a paper such as a referendum petition is that person's own name written by him or by another with his knowledge, in his presence and by his direction, either with or without his mark. The inhibition of the statute as to signing a name other than one's own does not, when the long established legal meaning of the word "signing" is kept in mind, operate to deprive an elector under some disability, temporary or permanent, of exercising a constitutional right through the manual act of another.

The court however, rules out all so-called signatures not coming within the strict limits of its definition. On the parts of petitions not ruled out *in toto* for the before stated reasons, 188 names are ruled out as invalid signatures, as non-electors and for inability to locate either the person or the person and address.

It is further urged that the statutory requirement that each signer "shall place on such petition after his name, the date of signing, his place of residence including street and number, if any, and the ward and precinct," has not been followed in that in 2,291 instances the date, in 3,896 instances the ward and in 4,763 the precinct have been entered on the petition in handwriting other than that of the signer. To this it is sufficient to say that the court holds the placing of this data upon the petition by someone else for the signer to be a sufficient compliance with the statute.

For the various reasons stated above, 2,244 names have been eliminated from the petition. As 5,528 names in all appear thereon, 3,284 signatures remain.

By the procedure outlined in the statutes and followed in this case the basis for the required number of petitioners is the total number of votes cast for mayor at the last preceding election. This number was 40,481. The charter of the city of Youngstown has fixed the num-

ber of electors necessary for a referendum petition as six per cent.   In this case therefore 2,429 valid signatures are needed.

If the question of withdrawals were not involved it is thus readily seen that in spite of the large number of signatures invalidated for the irregularities found, sufficient, 3,284 to be exact, would remain to require the certification of the ordinance to a referendum.

Two thousand one hundred twenty-two letters purporting to be withdrawals of names from the petition were filed with the city clerk before the filing of the first mandamus action on August 20.   The last day for filing referendum petitions was August 10.   Previous to August 18, 150 letters purporting to be revocations of the withdrawals of the signers' signatures from the petitions were presented to the clerk, who refused to receive them.

The Supreme Court in *State, ex rel.,* v. *Rupert,* 99 O. S., 17, held that in the absence of statutory provisions to the contrary an elector, signing a referendum petition, has a right to withdraw his name therefrom before official action is taken thereon by the clerk, or before an action in mandamus is brought.   The court said that the legislature in Sec. 4227-2, G. C., "evidently recognized this right, and afforded the signers of a referendum petition an opportunity for its exercise by providing in this section that the clerk shall not certify such petition to the board of deputy supervisors of elections until after the expiration of ten days from the date of filing the same."

It might be said in connection with the last observation that Sec. 4227-8 provides that after a petition has been filed with the clerk it "shall be kept open for public inspection for ten days."   That is the declared purpose for the delay, rather than to receive withdrawals.

This court, of course, is conclusively bound to follow the holding of the Supreme Court and will do so.   Yet in view of the fact that not a single incumbent of the Supreme bench as at present constituted participated in that ruling, and in view of the grave question of public policy involved a few reflections may be permitted.

It is held by most courts of last resort outside of Ohio that one who voluntarily signed a petition could not, except

for fraud, withdraw his name therefrom after the filing with the proper officer and after the expiration of the time within which another petition could be filed.  It is held that a public interest has attached to the proceeding, ref- erendum or what it might be, thus voluntarily set in motion, which the petitioners cannot thereafter be capri- ciously permitted to injure or to undo.  As one court says: "He should not be allowed to play fast and loose with the interests of society."   (64 S. W., 646.)

Only a few witnesses were heard as to the manner in which the 2,122 so-called withdrawals in this case were obtained.  Enough appeared in these few instances to show the methods and pressure used to secure this large number of withdrawals.  No claim of fraud or misrep- resentation in securing the signatures to the original peti- tions is made in these withdrawals.  A printed form is used in all instances, simply withdrawing the name and directing that same be not counted as a petitioner.  These withdrawals are not in the true sense either voluntary or on individual initiative.  Such an organized and pow- erful pressure to prevent the exercise of a public power is a demoralizing interference with a function of citizen- ship which this court deplores and must condemn.

As the legislature has carefully and clearly guarded the method of invoking a municipal referendum, it must go further and protect the referendum when invoked; and this court feels it its duty to point out the necessity of safeguarding this right by forbidding withdrawals after filing with the proper officer and when it is too late to file other petitions.  This would tend to make an elector more careful of what he signed in the first place, as his signature to a referendum petition would be like his bal- lot which he cannot change his mind about and withdraw when it is once cast.

Referendums on state laws and constitutional amend- ments are governed by a provision that if petitions there- for are, not later than forty days before the election, proved insufficient, ten additional days shall be allowed for the filing of additional signatures to such petitions. The uncertainty arising from the ability of inconstant electors, influenced by powerful interests, to withdraw

from a municipal referendum petition, with the accompanying inability of those interested to make good the defection should be similarly prevented in cities, either by statute or by provision in the city charter.

By voluntary stipulation the relator chose not to introduce any evidence inquiring into the circumstances under which these 2,122 withdrawals were secured. Of these withdrawals, 79 were revoked in writing before the clerk acted officially on the petitions or an action in mandamus was brought. This court is unable to see why, if withdrawals may be received by the clerk until he acts on the petition, revocations of such withdrawals may not also be received during the same period. The petition remains unaffected until he acts, and his action is upon the petition and data as they stand at the time of his action.

As important public and individual rights and official duties are involved in this proceeding and the procedure which gave rise to it, something should be said at this point about the functions and attitude of the city clerk. While by charter this officer is the appointee and employee of council and serves during its pleasure, it must be made plain that when a referendum is sought on an ordinance of council he is not simply identified with council and in opposition to those who seek to refer its enactments to a vote. Greater than council is the people, the electorate, of the city, whose servants the council and clerk alike are. Instead of an attitude of hostility and obstruction, it is incumbent on the clerk to actively but impartially assist those electors seeking to exercise a reserved public power. There was no reason why the clerk should not have received and filed the revocations of withdrawals as well as the withdrawals themselves, regardless of what he finally might do with them in connection with the certification.

As the petitions were by statute held open for public inspection for ten days it was proper for the clerk to afford interested persons facilities for examination, but the defacing of the petitions by letters, check marks, lines and crosses was outside his province and power to permit and proved of some embarrassment to the court.

Some misunderstanding exists as to the nature and scope of the authority of the clerk to pass on the question

as to whether the referendum petition complied with the provisions of law.   He is only a ministerial officer, and while he is required to exercise an intelligent discretion in the performance of this duty, this discretion is not judicial; it is ministerial only.   Hence he cannot go into questions not apparent on the face of the petition itself, and which require the aid of witnesses to determine.   Such questions as whether affidavits were valid or whether signatures were genuine or made with authority are judicial and outside of the scope of a ministerial inquiry.   He could count the number of names, determine whether addresses, dates, ward and precinct were affixed, whether each part to the petition had an affidavit attached, whether signers were on the face of things electors of Youngstown, and go into similar matters apparent on a superficial examination. The law then guides him.   It says that the petitions and signatures upon such petitions shall be *prima facie* presumed to be in all respects sufficient.

The decision of the clerk in this case not to certify the referendum petition was not made from matters appearing within the scope of his ministerial duty.   It was made from matters which it is true are found on judicial inquiry to exist, but which he had no power or facilities to determine.   When, on its face and within the proper scope of his inquiry, the petition appears sufficient, it is the clerk's duty to certify because the law makes the petition and signatures *prima facie* sufficient, leaving to the courts their proper judicial inquiry if one is invoked.

Returning to the question of withdrawals.   Applying the ruling of the Supreme Court thereto, this court is by the stipulation entered into by counsel conclusively bound to consider 1,187 names on the parts of the petitions which have not been entirely ruled out, as withdrawn.   Giving effect to the 79 revocations, 1,108 names then are withdrawn from the 3,284 signatures previously remaining and 2,176 valid signatures are left.   As 2,429 are required, the referendum must fail and the peremptory writ of mandamus must be denied with exceptions to the relator.   As the court is satisfied the relator had good cause to believe that his allegations were well founded he is allowed his costs.